THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

RICHARD HOFFMAN and ROMY HOFFMAN, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

HOMETAP INVESTMENT PARTNERS III SPV, LCC; HOMETAP EQUITY PARTNERS, LLC; and DOES 1-10;

Defendants.

NO. 2:26-cv-01124-JNW

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY ACTION**

**ORAL ARGUMENT REQUESTED**



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

# TABLE OF CONTENTS

Page


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 3

A. In a moment of financial strain, the Hoffmans borrowed money from Hometap ........ 3

B. Hometap advances money in exchange for a future payment obligation secured by a mortgage ........ 4

C. Hometap is guaranteed repayment, independent of the housing market ........ 6

D. Hometap touts its guaranteed returns to its investors ........ 8

III. ARGUMENT ........ 8

A. This Court must adjudicate challenges to the validity of Hometap's delegation clause. ........ 9

B. The Truth in Lending Act prohibits any terms mandating arbitration in the Hoffmans' residential mortgage contract ........ 13

1. Hometap's product is a residential mortgage loan under the plain text of TILA ........ 13

2. Hometap's arguments cannot be squared with TILA's text and Ninth Circuit caselaw ........ 19

3. Agency commentary on a regulation does not override the plain text of TILA ........ 22

C. Hometap's delegation clause and arbitration provision are unconscionable under Washington law ........ 24

1. The delegation clause is procedurally unconscionable ........ 25

IV. CONCLUSION ........ 26




TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Bielski v. Coinbase, Inc.*,
87 F.4th 1003 (9th Cir. 2023). .......... 10

*Burnett v. Ala Moana Pawn Shop*,
3 F.3d 1261 (9th Cir. 1993) .......... *passim*

*Coinbase, Inc. v. Suski*,
602 U.S. 143 (2024) .......... *passim*

*Commonwealth v. Hometap Equity Partners, LLC.*,
2025 WL 2468564 (Mass. Super. Aug. 21, 2025) .......... 18, 23

*CompuCredit Corp. v. Greenwood*,
565 U.S. 95 (2012) .......... 12

*Daniels-Hall v. Nat'l Educ. Ass'n*,
629 F.3d 992 (9th Cir. 2010) .......... 21

*Feeman v. Bridge It, Inc.*,
2026 WL 880508 (S.D.N.Y. Mar. 31, 2026) .......... 18, 20

*Fli-Lo Falcon, LLC v. Amazon.com, Inc.*,
97 F.4th 1190 (9th Cir. 2024) .......... 12

*Foster v. Equitykey Real Estate Invs. L.P.*,
2017 WL 1862527 (N.D. Cal. 2017) .......... 23

*Fowler v. Equitable Tr. Co.*,
141 U.S. 384 (1891) .......... 14

*Fraser v. Goodale*,
342 F.3d 1032 (9th Cir. 2003) .......... 21

*Heckman v. Live Nation Ent., Inc.*,
120 F.4th 670 (9th Cir. 2024) .......... 11

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) .......... 11, 12



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

*Honchariw v. Cnty. of Stanislaus*,
530 F. Supp. 3d 939 (E.D. Cal. 2021)
*aff'd*, 2022 WL 522287 (9th Cir. Feb. 22, 2022) .......... 22

*In re Stone*,
671 B.R. 752 (Bankr. D. Colo. 2025) .......... 18

*In re Tristar Esperanza Props., LLC*,
782 F.3d 492 (9th Cir. 2015) .......... 10

*Johnson v. Ryan*,
55 F.4th 1167 (9th Cir. 2022) .......... 9

*Knapke v. PeopleConnect*, Inc,
38 F.4th 824 (9th Cir. 2022) .......... 8, 22

*Lim v. TForce Logistics*, LLC,
8 F.4th 992 (9th Cir. 2021) .......... 25

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 22

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) .......... 14

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022) .......... 9

*Moss v. Cleo AI Inc.*,
799 F. Supp. 3d 1152 (W.D. Wash. 2025) .......... 18

*New Prime Inc. v. Oliveira*,
586 U.S. 105 (2019) .......... 11

*Noel v. Roblox Corp.*,
2024 WL 3747454 (N.D. Cal. 2024) .......... 8

*Olson v. Unison Agreement Corp.*,
2025 WL 2254522 (9th Cir. Aug. 7, 2025) .......... *passim*

*Orkin v. Taylor*,
487 F.3d 734 (9th Cir. 2007) .......... 25



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

*Orubo v. Activehours*, Inc.,
780 F. Supp. 3d 927 (N.D. Cal. 2025) .......... 15

*Persinger v. Sw. Credit Sys., L.P.*,
20 F.4th 1184 (7th Cir. 2021) .......... 14

*Revell v. Grant Money, LLC*,
808 F. Supp. 3d 1036 (N.D. Cal. 2025) .......... 18

*Rossman v. Fleet Bank (R.I.) Nat'l Ass'n*,
280 F.3d 384 (3d Cir. 2002) .......... 13

*Scott v. Lloyd*,
34 U.S. 418 (1835) .......... 14

*Singhal v. Unison Agreement Corp.*,
2023 WL 2734230 (S.D. Fla. 2023) .......... 22

*Smith v. Berryhill*,
587 U.S. 471 (2019). .......... 14

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560 (2012) .......... 14

*Tu v. Experian Info. Sols., Inc.*,
2025 WL 1134612 (S.D. Cal. 2025) .......... 8

*United States v. Gonzales*,
520 U.S. 1 (1997) .......... 10

*Vickery v. Empower Fin., Inc.*,
2025 WL 2841686 (N.D. Cal. Oct. 7, 2025) .......... 18

**STATE CASES**

*Adler v. Fred Lind Manor*,
103 P.3d 773 (Wash. 2004) .......... 25

*Burnett v. Pagliacci Pizza, Inc.*,
470 P.3d 486 (Wash. 2020) .......... 24, 25, 26

*Mattingly v. Palmer Ridge Homes LLC*,
238 P.3d 505 (Wash. Ct. App 2010) .......... 25



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

*Muskal v. Point*,
CV 2025-024855, Dkt. 005 (Ariz. Sup. Ct. Dec. 17, 2025) .......... 18

*Schroeder v. Excelsior Mgmt. Grp., LLC*,
297 P.3d 677 (Wash. 2013) .......... 6

*Ten Bridges, LLC v. Guandai*,
474 P.3d 1060 (Wash. Ct. App. 2020) .......... 20

**FEDERAL RULES AND STATUTES**

12 C.F.R. pt. 226, Supp. I, Subpt. A, cmt. 2(a)(14)(1) .......... 22

12 C.F.R. pt. 226, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(viii) .......... 23, 24

Fed. R. Evid. 803(17), 902(5) .......... 21

15 U.S.C. § 1602(bb)(1)(B) .......... 20

15 U.S.C. § 1602(cc) .......... 16, 17, 21

15 U.S.C. § 1602(cc)(2) .......... 18

15 U.S.C. § 1602(dd)(5) .......... 13, 14, 24

15 U.S.C. § 1602(f) .......... 14

15 U.S.C. § 1639c(e)(1) .......... *passim*

**STATE STATUTES**

RCW § 61.24.020 .......... 5

RCW § 31.04.505(5)(b) .......... 18

**OTHER AUTHORITIES**

59A Am. Jur. 2d Partnership § 270 .......... 6

Controversy, American Heritage Dictionary (5th ed. 2018) .......... 10

Debt, *Black's Law Dictionary* .......... 16, 20

Debt, *Oxford English Dictionary* (1980) .......... 14



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Debt, *Webster's New Collegiate Dictionary* (9th ed. 1983) .................................... 14

Debt, *American Heritage Dictionary* (1st ed. 1969)............................................... 14

Investment, *Black's Law Dictionary* (12th ed. 2024) ............................................ 23

Option, American Heritage Dictionary (1st et. 1969) ............................................ 23

Restatement (Second) of Contracts § 25 ................................................................ 23

Univ. of Wash. Evans Sch. of Pub. Policy & Governance, *Home Equity Sharing Agreements in Washington State* 16 (2025)............... 7



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

## I. INTRODUCTION

For many Americans, their home is their financial anchor. A person's home is often the product of years of savings, a source of stability when times get tough, and the primary legacy they will leave to their children. For that reason, state and federal laws create strong protections for homeowners when they use their homes as collateral in exchange for an advance of money. And these laws were further strengthened after the 2008 financial crisis, which exposed the dangers of complex mortgage products with risks that homeowners do not adequately understand. Such safeguards are crucial for homeowners. But they also limit some of the most lucrative predatory practices. As a result, some companies seek out ways to evade these rules, designing increasingly complex mortgages that they claim are exempt from these legal protections for homeowners.

Hometap is one such company. It has designed a complex mortgage that poses greater risks than more traditional mortgages, but purports to be exempt from laws protecting homeowners. Hometap then ensnares thousands of homeowners who do not understand its complex and confusing product.

That is the situation for Richard and Romy Hoffman. Several years ago, serious medical problems forced these two Washington homeowners to take time away from work. This loss of income, combined with mounting medical costs, put the Hoffmans in a difficult financial situation. To cover these costs, the Hoffmans took out a loan from Hometap, which was secured by a deed of trust on their home.

Hometap advanced the Hoffmans $179,000, which was equivalent to 29.833% of their home's appraised value in 2022. What the Hoffmans didn't realize is that, in ten years or less, they would need to pay Hometap vastly more money than they received or risk losing their home.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Hometap cannot deny that it does not comply with federal and state mortgage laws. Instead, it claims its product is not a residential mortgage loan at all, asserting that its loan is an "option" or "investment." But courts across the country have rejected virtually the same argument. That includes a recent decision by the Ninth Circuit. States and regulators, including Washington's Department of Financial Institutions, have determined that products like Hometap's are hidden residential mortgage loans.

To evade judicial scrutiny, Hometap is trying to force the Hoffmans out of court and into arbitration. That request should be denied. Under the Truth in Lending Act, "[n]o residential mortgage loan … may include terms which require arbitration." 15 U.S.C. § 1639c(e)(1). And Hometap's product is a residential mortgage loan: Hometap provides homeowners an advance of money, secures that advance with a deed of trust, and then requires payment within 10 years or less.

Hometap argues that this Court lacks the power to decide whether federal law bars mandatory arbitration because the contract contains a "delegation clause." But a delegation clause is itself just a kind of arbitration clause: It's an agreement to arbitrate disputes over the validity of the contract's broader arbitration provision that requires the parties to arbitrate the merits. It's therefore just as invalid under TILA as any other arbitration requirement in a residential mortgage contract.

Finally, even if the delegation clause and arbitration provision were not invalid under TILA, they are also unenforceable under Washington law. This was a take-it-or-leave-it contract of adhesion presented in a manner that deprived the Hoffmans of a fair opportunity to understand the arbitration terms, and the delegation clause in particular.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

## II. BACKGROUND

### A. In a moment of financial strain, the Hoffmans borrowed money from Hometap.

The Hoffmans are Washington homeowners who, like many others, turned to the equity in their home to help them weather a period of financial distress.

In 2021, Mr. Hoffman was diagnosed with kidney cancer. Dkt. No. 1-2 (Complaint) ¶ 53. He underwent surgery to remove his kidney the following year. *Id.* At about this time, Ms. Hoffman also had to have surgery to address serious medical issues with her feet. *Id.*

Time off from work for medical appointments and recovery caused their income, which was already limited, to plummet. Their expenses, meanwhile, had only risen as they tried to cover varied medical bills. *Id.* ¶ 54. To fill that gap, the Hoffmans turned to their only significant asset: their home. *Id.* ¶ 55.

While researching their options to access their home equity, they found Hometap and filled out an online application. Soon after, the Hoffmans received Hometap's offer: in exchange for a share of the Hoffmans' home value – 49.722% if that value rose and 41.435% if it fell -- Hometap would advance them $179,000 (29.833% of the home's appraised value). *Id.* ¶ 59.

The Hoffmans traveled to a title company in Lynwood to sign the documents Hometap filed with its motion. Dkt. No. 1-2 ¶ 64; Dkt. Nos. 14-1-4. Among the documents given to the Hoffmans at signing was a document entitled "Investment Disclosures." Declaration of Richard Hoffman Decl., Ex. A. The six-page document promises to provide information homeowners "need to know before signing your Investment Documents." *Id.* at 1. In a section titled "Important Information about Your Investment," Hometap highlights many of the Investment's terms, including the homeowner's obligation to maintain the property and pay for any mortgage and taxes. *Id.* at 3. The section also notes that a homeowner who fails to adhere to



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Hometap's terms could lose their property. *Id.* Elsewhere, the Disclosures list the fees that will be paid to Hometap and other parties from the gross loan amount. *Id.* at 2. The Disclosures create the overall impression that they disclose all important terms of the transaction, but make no mention of arbitration. *Id.* at 1-6. Another document – the "Investment Signing Instructions" – lists the nine documents that made up the Hoffman's complete "Investment Package." Hoffman Decl., Ex. B. This list makes no reference to an arbitration agreement. *Id.*

The Hoffmans signed the package of documents totaling more than 60 pages. The lengthiest document the Hoffmans signed is the Option Purchase Agreement. Dkt. No. 14-1. The document (including attached schedule) is 37 pages long with signatures appearing on pages 29 and 30. There are no places for initials or signatures on any other page in the Option Purchase Agreement. *Id.* The arbitration provision Hometap seeks to enforce spans pages 23-25. *Id.* at 24-26.[1] The Hoffmans did not see the complete Option Purchase Agreement before they arrived at their signing appointment. Dkt. No. 1-2 ¶ 65.

The Hoffmans also signed a 13-page Deed of Trust before a notary. The Deed of Trust gives Hometap the power to "sell the property at a nonjudicial foreclosure sale." Dkt. No. 14-3 at 7, section 7(f).

**B. Hometap advances money in exchange for a future payment obligation secured by a mortgage.**

Hometap advances money to homeowners in exchange for a future payment obligation, secured by a mortgage. Here, Hometap gave the Hoffmans an advance worth approximately 29.833% of the value of their home on the condition that in 10 years or less, they must pay Hometap 49.722% of the home's value (or 41.435% if the home has decreased in value). Here's how it worked:

[1] For documents identified by Dkt. No., cites are to page numbers assigned by the Court's electronic filing system. For all other documents, cites are the document's internal page numbering.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

*First,* Hometap made the Hoffmans an advance payment of $179,000, which was equivalent to approximately 29.833% of the appraised value of the home. Dkt. No. 1-2 ¶ 59. The Hoffmans did not actually receive the full amount of the "Investment Amount," however, as Hometap charged them thousands of dollars in fees, including a $5,370 "Investment Fee." *Id.* ¶ 60. Hometap also required the Hoffmans to apply $61,200 of the advance to payoff their second mortgage. *Id.* ¶ 61; *see also* Dkt. No. 14-1 at 36 (table titled Investment Fees and Costs Deducted from Investment Amount).

*Second*, Hometap's contract requires the Hoffmans to repay Hometap in 10 years or less. Dkt. No. 41-1 § 1.5. The contract requires repayment at the end of the "option period," which occurs upon the first of four specified events," whichever comes first: (1) the Hoffmans sell their home (2) they choose to repay Hometap; (3) they both pass away resulting in a conveyance of the home to their estate or heirs; or (4) their 10-year term expires. Upon any of these events, Hometap receives payment for its "Hometap Share." *Id.*, §§ 1.5, 2.4, 2.6(d) 2.7. The "Hometap Share" either 41.435% or 49.722% of the value of the Hoffmans' home (along with any additional "Hometap Cure Payments") *Id.*, § 7.2(b). The Hometap Share is capped at a 20% annualized rate of return on the Investment Amount. Hometap calls this the "Hometap Cap." Dkt. No. 14-1 at 37.

*Third*, Hometap's contract and future payment are secured by a deed of trust on the Hoffman's home. Dkt. No. 14-3 A deed of trust is a form of mortgage. *See* RCW § 61.24.020 ("[A] deed of trust is subject to all laws relating to mortgages on real property."). The deed of trust states that it secures the Hoffmans' "payment obligations in the Hometap Homeowner Agreement." Dkt. No. 14-3 at 3 (section 2(c)). This means that if the Hoffmans fail to pay Hometap or default in any other way, Hometap can non-judicially foreclose on their home. Dkt. No. 14-3 at 7 (Section



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

7(f)); Dkt. No. 14-1 at 20 (section 7.2(c) entitled "Power of Foreclosures and Sale Under State Laws); *see also Schroeder v. Excelsior Mgmt. Grp., LLC*, 297 P.3d 677, 682 (Wash. 2013) (noting "the relative ease with which lenders can forfeit borrowers' interests and the lack of judicial oversight in conducting nonjudicial foreclosure sales").

### C. Hometap is guaranteed repayment, independent of the housing market.

Hometap presents itself as partnering with homeowners—as reflected in its name, Hometap Equity Partners—and purports to share in the risk that the home might lose in value. In fact, Hometap's contract expressly disclaims that Hometap is "not a partner" with the homeowner, Dkt. No. 14-1 § 8.4, likely to avoid any of the important duties of an actual partner, such as acting in the others' best interest, 59A Am. Jur. 2d Partnership § 270. And as this case shows, Hometap has carefully structured the transaction to ensure that its future payment will be far larger than the advance it paid, even if the home loses value.

The primary way Hometap does so is by requiring the Hoffmans to pay Hometap a far greater percentage of the value of their home (at least 41.435%) than it advanced (29.833%). Dkt. No. 1-2 ¶ 59. Given this disparity, for Hometap's payout to drop below its advance, the Hoffman's Hat Island home would have to drop in value by 28%. Federal data going back a half-century shows that the average home prices in Washington State and the United States have never fallen that much. The worst drop was during the 2008 financial crisis, where prices for these areas only fell between 19 and 25%.[2] So Hometap will be repaid in full unless there is a crash

---

[2] Prices dropped from a peak index of 501.9 in Q4 of 2007 to a low of 375.44 in Q2 of 2012, a drop of 25.2%. All-Transactions House Price Index for Washington, Federal Reserve of St. Louis (last accessed Jan. 26, 2026), https://perma.cc/VXY9-76TB.; *See, e.g.*, All-Transaction House Price Index for the United States, Federal Reserve of St. Louis, (last updated accessed Jan. 26, 2026), https://perma.cc/J3FM-SGH7.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

that is more catastrophic than the worst crash in modern history—a crash in which other mortgage lenders would also see devastating losses, as they did in 2008. Indeed, Hometap's "Investment Disclosures" show that Hometap will be paid even if the house has depreciated in value at settlement. Hoffman Decl., Ex. A at 5 (Settlement Scenario 2: Depreciation). And, historical data on transactions like Hometap's in Washington show that the lender not only recovers its advance in practice, but also receives usurious interest. Univ. of Wash. Evans Sch. of Pub. Policy & Governance, *Home Equity Sharing Agreements in Washington State* 16 (2025)[3] (report commissioned by Washington Department of Financial Institutions finding that two companies offering "shared value" products like Hometap's in Washington earned an average annual return between 16 and 19% on their transactions.)

Hometap also charges thousands in fees, which further increase the company's profit. Dkt. No. 1-2 ¶ 60. And Hometap requires the homeowner to carry the costs of ensuring Hometap's future payment. In entering the contract, Hometap didn't assume the responsibilities of co-ownership. Instead, the Hoffmans were required to cover all such costs, including taxes, repairs, and an insurance policy that also covered Hometap. Dkt. No. 14-1 § 6.2(e). Otherwise, Hometap could foreclose or demand "Hometap Cure Payments," which accrue interest and must be paid back. *Id.* § 7.2(b).

Hometap says it is "just not reality" that "Hometap is somehow guaranteed to recoup the $179,000" it loaned the Hoffmans. Mot. at 10. The Hoffmans sent Hometap five targeted interrogatories to test Hometap's claim. Chandler Decl., Ex. 1. Hometap refused to respond to any of the requests. *Id.*

---

[3] Available at https://dfi.wa.gov/sites/default/files/reports/HESA-Final-Report-July-2025.pdf



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**D. Hometap touts its guaranteed returns to its investors.**

Locking homeowners into its mortgages is only the first step in Hometap's business model. After that, like other mortgage lenders, Hometap bundles and securitizes these mortgages and sells them to Wall Street investors.[4] And while Hometap argues in court that it risks not being paid back if the housing market drops, it presents a different face to its investors. It boasts that it has consistently provided "strong, risk-adjusted return" and "in both rising and declining home value environments."[5] Reflecting this, Hometap's security offerings have been exceedingly lucrative, selling for hundreds of millions of dollars.[6]

## III. ARGUMENT

"[T]he [Federal Arbitration Act's] procedure mirrors the three phases of federal civil lawsuits: a motion to compel arbitration akin to a motion to dismiss; followed by optional discovery before summary judgment, if the motion is denied; followed by a mini-trial, if necessary." *Knapke v. PeopleConnect*, Inc, 38 F.4th 824, 833 (9th Cir. 2022). Thus, a court first determines if the motion can be decided "as a matter of law" akin to a "motion to dismiss." *Noel v. Roblox Corp.*, 2024 WL 3747454, at *6 (N.D. Cal. 2024). If not, "the case moves to the next phase: [arbitration-related] discovery." *Id.*; *see also Tu v. Experian Info. Sols., Inc.*, 2025 WL 1134612, at *9 (S.D. Cal. 2025). Following that, a court must evaluate whether any genuine disputes of material fact exist, *Knapke*, 38 F.4th at 831, which requires

---

[4] *See* Hometap Announces Closing of $278 Million Securitization of Hometap-originated Home Equity Investments, Hometap, (Oct. 7, 2024) https://www.hometap.com/press-release/hometap-a278-million-securitization

[5] Hometap Investment Homepage, https://invest.hometap.com/ (last accessed May 18, 2026)

[6] *See, e.g.,* Hometap Closes $300M Securitization of Hometap-originated Home Equity Investments, Citybiz (Sept. 8, 2025), https://www.citybiz.co/article/741421/hometap-closes-300m-securitization-of-hometaporiginated-home-equity-investments



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

"view[ing] the evidence in the light most favorable to the nonmoving party," *Johnson v. Ryan*, 55 F.4th 1167, 1179 (9th Cir. 2022). And if factual disputes remain, the case proceeds to a mini-trial on arbitration, for which the Hoffmans request a trial by jury.

In conducting these analyses, the Supreme Court has made clear that any "federal policy" about arbitration "is about treating arbitration contracts like all others, not about fostering arbitration" and "a court may not devise novel rules to favor arbitration over litigation." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022).

### A. This Court must adjudicate challenges to the validity of Hometap's delegation clause.

Hometap argues that this court may not hear the Hoffmans' challenge to the arbitration provision because it delegates arbitrability to the arbitrator. This is wrong. The Hoffmans expressly challenge the delegation provision's validity under federal and state law. This Court must resolve those challenges. *Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024). And Hometap's delegation clause is unenforceable under TILA and unconscionable under Washington law.

As the Supreme Court recently explained, this follows from "the fundamental principle that arbitration is a matter of contract." *Coinbase*, 602 U.S. at 147. To "refer[] a dispute to an arbitrator," there must be some valid and enforceable arbitration agreement. *Coinbase*, 602 U.S. at 149. And a delegation clause "is simply an additional, antecedent agreement" to arbitrate arbitrability that is subject to the same principles as "any other." *Id.* at 148. Accordingly, for a delegation clause, as much as any other agreement to arbitrate, "[i]f a party challenges the validity of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that arbitration



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

agreement." *Id.* at 151. "To hold otherwise would be to impermissibly elevate a delegation provision over other forms of contract." *Id.* at 152.

"[T]o sufficiently challenge a delegation provision, the party resisting arbitration must specifically reference the delegation provision and make arguments challenging it." *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1011 (9th Cir. 2023). That requirement is easily satisfied here, as the Hoffmans expressly challenge that any delegation clause would be invalid under TILA and Washington law.

*First*, TILA prohibits the inclusion of a delegation clause in the Hoffmans' contract. Under TILA, "[n]o residential mortgage loan … may include terms which require arbitration … as the method for resolving any controversy or settling any claims arising out of the transaction." 15 U.S.C. § 1639c(e)(1) (emphasis added). A "controversy" means broadly a "dispute." Controversy, *American Heritage Dictionary* (5th ed. 2018); Controversy, Cornell L. Sch., *Legal Information Institute*, https://www.law.cornell.edu/wex/controversy ("actual dispute"). "Read naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind." *United States v. Gonzales*, 520 U.S. 1, 5 (1997). And "'[a]rising out of' are words of much broader significance than 'caused by'" and include "'having its origin in,' 'growing out of' or 'flowing from' or in short, 'incident to, or having connection with.'" *In re Tristar Esperanza Props., LLC*, 782 F.3d 492, 497 (9th Cir. 2015). Accordingly, section 1639c(e)(1) prohibits requiring arbitration to resolve disputes of any kind that are incident to or connected with a residential mortgage transaction.

That provision clearly covers a delegation clause in a residential mortgage contract. A delegation clause is a "term[]" that "require[s] arbitration" to resolve a "controversy" about whether the parties must arbitrate disputes about the



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

residential mortgage transaction. 15 U.S.C. § 1639c(e)(1). It is, therefore, an agreement to arbitrate a dispute incident to or connected with that transaction. That is exactly what TILA forbids—and, as explained below, exactly the case here, as the transaction here is a residential mortgage loan. And if there were any ambiguity about whether section § 1639c(e)(1) covers delegation clause, the provision must be "liberally construed." *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993).

Second, the Hoffmans specifically challenge that the delegation clause itself is unconscionable under Washington law.

Where a party challenges a delegation clause on grounds that "appl[y] equally to the whole contract and to an arbitration or delegation provision, a court must address that challenge." *Coinbase*, 602 U.S. at 151 (emphasis added). And such a challenge may require looking to the rest of the contract, as "[i]n deciding whether a delegation clause is unenforceable, [a court's] analysis is not limited to the bare text of the clause." *Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 680 (9th Cir. 2024). "A court must consider the parts of the agreement that impact the delegation provision." *Id.* at 681.

Hometap contends that this Court "possesses no power to decide the arbitrability issue" because of the delegation clause. Mot. at 8 (citing *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019)). But in *Henry Schein*, the Supreme Court confirmed that a court must "determine whether a valid arbitration agreement exists" before it refers a dispute to arbitration. 586 U.S. at 69; *see also New Prime Inc. v. Oliveira*, 586 U.S. 105, 111 (2019) ("The parties' private agreement may be crystal clear and require arbitration of every question under the sun, but that does not necessarily mean the Act authorizes the court to stay litigation and send the parties to an arbitral forum."). In resolving the dispute



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

before it, the Court merely reiterated that an arbitrability challenge that applies only to the underlying arbitration agreement does not invalidate antecedent agreements to arbitrate arbitrability. *Henry Schein, Inc.* 586 U.S. at 72 (express[ing] no view about whether the contract at issue in this case in fact delegated the arbitrability question to an arbitrator" and inviting the Court of Appeals to consider the issue on remand). Unlike the plaintiffs in *Henry Schein, Inc.*, the Hoffmans challenge the delegation clause directly, not through the underlying arbitration agreement. And, because the Hoffmans contend that the delegation clause is invalid under TILA, this Court must resolve that challenge.

Hometap cites *Fli-Lo Falcon, LLC v. Amazon.com, Inc.,* 97 F.4th 1190, 1199 (9th Cir. 2024), for the proposition that this Court's inquiry must end once it determines that "an arbitration agreement exists." Mot. at 7. But, the Ninth Circuit qualified that statement in the very next of its opinion: Even when it is clear an unmistakable that the parties "agreed to arbitrate arbitrability," the "remaining question is whether the particular agreement to *delegate* arbitrability—the delegation provision—is itself unconscionable." *Fli-Lo Falcon*, 97 F.4th at 1199 (cleaned up).

The entire first half of the *Fli-Lo* opinion also refutes Hometap's cramped view of a district court's obligation to ensure an enforceable agreement exists before compelling arbitration even under a delegation clause. Because before even discussing the delegation clause, the Ninth Circuit carefully analyzed whether the FAA applied to the contract at issue. *Id.* at 1194–98 (holding that transportation worker exception the FAA did not apply since plaintiffs were businesses). The Hoffman's challenge to Hometap's arbitration clause is similar in that they point to a separate federal law that prohibits arbitration clauses in mortgages all together. *See CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (recognizing that the



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

FAA's mandate to enforce arbitration clauses according to their terms can be "overridden by a contrary Congressional command"). Hometap does not dispute that TILA's ban on arbitration clauses in mortgages is a clear Congressional command. Instead it argues that its agreement does not fit within TILA's scope. Mot. at 9.

Because the Hoffmans argue that the delegation clause is itself prohibited by TILA because it is just a species of arbitration clause in a mortgage, the Court "must consider the challenge[s]." *Coinbase*, 602 U.S. at 151.

**B. The Truth in Lending Act prohibits any terms mandating arbitration in the Hoffmans' residential mortgage contract.**

Hometap's product is a residential mortgage loan under TILA's plain text. Accordingly, it may not "include terms which require arbitration." 15 U.S.C. § 1639c(e)(1). That invalidates Hometap's arbitration provision and any delegation clause.

1. <u>Hometap's product is a residential mortgage loan under the plain text of TILA.</u>

TILA defines a "residential mortgage loan" broadly as "any consumer credit transaction … secured by a mortgage [or] deed of trust … on a dwelling." 15 U.S.C. § 1602(dd)(5). Hometap only disputes that its product qualifies as "credit," but the company's position is contradicted by the plain text of the statute.

In interpreting whether TILA applies to a transaction, courts must look "past the form of the transactions to their economic substance in deciding whether [TILA] applie[s]." *Burnett*, 3 F.3d at 1262. This reflects "Congress's concern with ensuring creditors could not evade TILA by characteriz[ing] their transactions so as to fall one step outside whatever boundary Congress attempted to establish." *Orubo v. Activehours*, Inc., 780 F. Supp. 3d 927, 938 (N.D. Cal. 2025); *see also Rossman v. Fleet Bank (R.I.) Nat'l Ass'n*, 280 F.3d 384, 392, 399 (3d Cir. 2002) (courts interpret TILA to ensure that companies may not "circumvent" their statutory "obligations"



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

through "strategic" product structures). This principle long predates TILA, as centuries of Supreme Court precedent insist that courts must look to substance, not labels, to determine whether lending laws apply: "There is no more familiar rule in the law than that the [lending] laws cannot be evaded by mere pretenses, shifts, or evasions." *Fowler v. Equitable Tr. Co.*, 141 U.S. 384, 403 (1891); *Scott v. Lloyd*, 34 U.S. 418, 446–47 (1835).

Statutory interpretation "begins with the statutory text, and ends there as well if the text is unambiguous." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 712 (9th Cir. 2025). And if there were any ambiguity, TILA must be "liberally construed to protect consumers." *Burnett*, 3 F.3d at 1262.

TILA's definition of credit easily encompasses Hometap's mortgage loan. To start, the broad reference to "*any* consumer credit transaction," 15 U.S.C. § 1602(dd)(5) (emphasis added), indicates that the definition must be read "expansively," *Smith v. Berryhill*, 587 U.S. 471, 479 (2019). TILA also defines the term "credit" broadly. Credit is "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). The term "debt" is not defined, so courts "give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). In ordinary English, a "debt" is "something owed." Debt, *Webster's New Collegiate Dictionary* (9th ed. 1983); Debt, *American Heritage Dictionary* (1st ed. 1969) ("something owed, as money, goods, or services"); Debt, *Oxford English Dictionary* (1980) ("something owed by one person to another"). Hometap itself acknowledges that a "'credit transaction' contemplates an agreement by which the right of deferred payment is promised in exchange for some form of consideration." Mot. at 9 (citing *Persinger v. Sw. Credit Sys., L.P.,* 20 F.4th 1184, 1195 n.5 (7th Cir. 2021)). Thus, "the right granted by a creditor to a debtor to defer payment of debt," 15 U.S.C. § 1602(f), means the right to defer



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

payment of "something owed," which could take many forms. Hometap's mortgage loan is a "consumer credit transaction" if it is a transaction that grants the homeowner the right to defer payment of "something owed."

This transaction falls squarely within this definition. The Hoffmans received an advance from Hometap. In exchange, they assumed an obligation to pay Hometap the "Hometap Share" of at least 41.435% of the value of their home. *See* Dkt. No. 1-2 ¶ 59. Hometap gave them a right to defer that payment for 10 years—or less, if the option period ended sooner due to, for example, sale of the home. Dkt. No. 14-1 § 2.5. And the deed of trust expressly secures the Hoffmans' "payment obligations in the Hometap Homeowner Agreement," including "payment of the Hometap Share owed to Hometap." Dkt. No. 14-3 at 3. If the Hoffmans don't pay what they owe Hometap, it can foreclose on the Hoffmans' home. *Id.* at 7. Or, as Hometap put it in its Investment Disclosures to the Hoffmans: "You may lose the property if you do not satisfy the obligations of the Option Purchase Agreement." Hoffman Decl., Ex. A at 3.

Hometap insists that the Hoffmans' only obligation is to "allow Hometap to share in [their] home's value according to its ownership interest." Mot. at 10. This is just a convoluted way of saying the Hoffmans will pay Hometap 49.722% of the value of their home, either from the proceeds of a sale, or directly. Dkt. No. 14-1 § 3.1(b)-(e); *see, e.g., Olson v. Unison Agreement Corp.*, 2025 WL 2254522, at *1, 4-5 (9th Cir. Aug. 7, 2025) (holding transaction with similar payment mechanism was credit). This makes sense. Making homeowners pay Hometap is its whole business model. It would come as a surprise to Hometap's investors, who have purchased hundreds of millions of dollars of securitized Hometap mortgages, if Hometap did not require homeowners to pay the company.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

If more were needed, this plain-text reading is confirmed by "read[ing] the words in their context and with a view to their place in the overall statutory scheme." *Mi Familia*, 129 F.4th at 713. TILA explicitly identifies as "credit" a wide range of payment obligations that have the same features as Hometap's loan.

For example, TILA expressly covers "nonrecourse" credit, 15 U.S.C. § 1602(cc), which is "[d]ebt for which the borrower is not personally liable, so that a creditor can collect only on the collateral securing the debt," Debt, *Black's Law Dictionary* (emphases added). When that collateral is a home, if "the home secured by the deed of trust falls significantly in value," the "nonrecourse obligation" can fall in value or even "not result in any payment." *Olson*, 2025 WL 2254522, at *3. By including nonrecourse obligations as forms of credit, the statute "expressly contemplates that a consumer credit obligation may exist even though the actual future obligation to pay back sums may be entirely contingent upon future events, including sufficient shared appreciation or equity." *Id.* And "[t]he entire structure of the arrangement" here "is designed to put [Hometap] in the same position, and to have the same right to payment, as an unadorned nonrecourse obligation to pay [Hometap] [49.722]% of the home's equity." *Id.* at *4.

The Ninth Circuit has held that TILA covers pawn shops, where the owner gives the borrower a smaller percentage of the value of a good in exchange for taking the good as collateral. *Burnett*, 3 F.3d at 1262. Then, either the borrower can buy back the good for a larger payment, or the lender keeps the security. *Id.* Here, Hometap paid the Hoffmans a smaller sum, 29.833% of the value of their home, up front. When payment comes due, the Hoffmans will be required to either directly pay Hometap a larger sum, up to 49.722% of the value of the home, or pay Hometap that amount from the proceeds of selling their home. That's even more obviously a debt than a pawn shop.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

TILA also includes reverse mortgage loans as a form of residential mortgage loan, which again illustrate the same principle. A "reverse mortgage" is a nonrecourse credit obligation where: (1) a homeowner is given "one or more advances"; (2) the company receives security through "[a] mortgage … against the consumer's principal dwelling"; and (3) any "any principal, interest, and shared appreciation or equity is due and payable" upon default or "only after (A) the transfer of the dwelling; (B) the consumer ceases to occupy the dwelling as a principal dwelling; or (C) the death of the consumer." 15 U.S.C. § 1602(cc). Here, (1) Hometap gave the Hoffmans an advance. Dkt. No. 1-2 ¶ 59. (2) In exchange, the Hoffmans provided a deed of trust on their home. *Id.* at ¶ 66. And (3) Hometap's payment is triggered by a transfer resulting from the homeowners' death, "sale of the [p]roperty," and any "[d]efault" such as no longer using the property as a principal residence, Dkt. No. 14-1 §§ 2.5 7.2. And at that point, the Hoffmans must pay Hometap an amount tied to the equity in their home. *Id.* at § 3.1 (after one of the specified events occurs, Hometap "shall have the right to exercise the Option" and demand payment from the Hoffmans). The Ninth Circuit has held that a similar product met a similar state law definition of reverse mortgage, and the same goes for Hometap. *Olson*, 2025 WL 2254522, at *3, 5.[7]

Statutory context thus confirms what TILA's text shows: Hometap's product defers payment of a debt and is therefore credit under the statute.

Given the above, it's unsurprising that courts across the country—including the Ninth Circuit—have rejected arguments from Hometap, and companies like it, that their products are categorically not credit or debt under TILA or state laws

---

[7] The transaction doesn't have to be a reverse mortgage to be subject to TILA's ban on mandatory arbitration: All residential mortgage loans are subject to that bar, 15 U.S.C. § 1639c(e)(1), and reverse mortgages are just one kind of residential mortgage. TILA's coverage of reverse mortgages is relevant because it sheds light on what can constitute a credit obligation.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

with similar terms. In *Commonwealth v. Hometap Equity Partners, LLC.*, 2025 WL 2468564, at *5 (Mass. Super. Aug. 21, 2025), a Massachusetts court considered on a motion to dismiss the very argument Hometap makes here, that its product "is not a loan and not a mortgage loan but an option to acquire a percentage ownership in property in exchange for a cash payment." The court rejected Hometap's arguments and emphasized that that Hometap's agreements are "in substance, loans." *Id.* at *6. While the case was decided under Massachusetts law, the requirement for showing extension of credit under TILA are substantially similar.

Similarly, in *Olson*, the Ninth Circuit held that product offered by one of Hometap's competitors met the ordinary language definition of "credit" under Washington law and accordingly was a hidden residential mortgage loan. 2025 WL 2254522 at *3. While *Olson* interpreted a Washington statute rather than TILA, the operative language and context are analogous to TILA's. *Compare* RCW § 31.04.505(5)(b) *with* 15 U.S.C. § 1602(cc)(2). Courts have therefore relied on *Olson* in analyzing whether a financial transaction is a disguised credit obligation under TILA. *See Moss v. Cleo AI Inc.*, 799 F. Supp. 3d 1152, 1159 (W.D. Wash. 2025); *Revell v. Grant Money, LLC*, 808 F. Supp. 3d 1036, 1049 (N.D. Cal. 2025); *Vickery v. Empower Fin., Inc.*, 2025 WL 2841686, at *5 (N.D. Cal. Oct. 7, 2025); *Feeman v. Bridge It, Inc.*, 2026 WL 880508, at *8 (S.D.N.Y. Mar. 31, 2026). Other courts confirm *Olson*'s conclusion as well. *See In re Stone*, 671 B.R. 752, 756-57 (Bankr. D. Colo. 2025) (sufficient allegations that similar transaction was residential mortgage under state law ); *Muskal v. Point*, CV 2025-024855, Dkt. 005 (Ariz. Sup. Ct. Dec. 17, 2025) (holding similar transaction was a residential mortgage loan under TILA). Hometap does not mention any of these decisions or even attempt to distinguish them.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

2. Hometap's arguments cannot be squared with TILA's text and Ninth Circuit caselaw.

Hometap points to a hodgepodge of features of the transaction that it claims prevent it from being "credit" under TILA. But Hometap's arguments improperly place form over substance, and the features Hometap identifies are all features of obligations that TILA expressly recognizes as credit.

Hometap contends that the transaction is not credit because the "[a]greement states, in bold and capitalized letters," that it is 'NOT A LOAN.'" Dkt. No. 14-1 (Agreement) at 2. But allowing a company to avoid lending laws simply by stating that transactions aren't loans is entirely inconsistent with the principle that courts must look past labels to "economic substance." *Burnett*, 3 F.3d at 1262.

Hometap also asserts that its product is not credit because it does not require repayment. According to Hometap, "[t]he Agreement does not require payment of *any* amount," Mot. at 10 (emphasis in original), because Hometap may "elect not to exercise its option." *Id.* But any creditor may choose not to collect a debt. *Olson*, 2025 WL 2254522, at *4. That choice does not change the underlying nature of the transaction. Moreover, Hometap's Deed of Trust Security Agreement provides that the Hoffmans have "payment obligations in the Hometap Homeowner Agreement." This includes "payment of the Hometap Share *owed* to Hometap." Dkt. No. 14-3 2, section 2(c) (emphasis added).

Hometap tries to wave away this payment obligation by saying that the Hoffmans do not have to "repay any monetary amount that Hometap paid to" them. In other words, because the sum that the Hoffmans must pay to Hometap is not measured in dollars but as a percentage of the value of their home, the "Hoffmans never have to repay [the] Investment Amount [and] keep it in all scenarios." Mot. at 9. This clumsy artifice must fail. *Burnett*, 3 F.3d at 1262 (when interpreting TILA, courts must look "past the form of the transactions to their economic substance in



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

deciding whether [TILA] applie[s]."); *see also Ten Bridges, LLC v. Guandai*, 474 P.3d 1060, 1063 (Wash. Ct. App. 2020) ("the form of a transaction cannot be used to evade a statute").

Debt need not be expressed as a specific sum of money. For example, for "nonrecourse debt," "a creditor can collect only on the collateral securing the debt"—with the result that the amount recovered will vary with the collateral's value. Debt, *Black's Law Dictionary*. There's also "contingent debt": "A debt that is not presently fixed but that may become fixed in the future with the occurrence of some event." *Id.* And TILA expressly includes credit obligations where the amount owed will vary, such as variable rate mortgages, 15 U.S.C. § 1602(bb)(1)(B), and mortgages where payment is tied to "equity" in the home or its "appreciation," *id.* § 1602(cc)(2); *see also Olson*, 2025 WL 2254522, at *3.

In short, representing the Hometap Share as a percentage of the Hoffmans' home value does not change the fact that it is a payment obligation. And the Hoffmans assumed that obligation in exchange for a $179,000 advance from Hometap. That is plainly a "credit transaction" under TILA. Hometap argues there are scenarios where it may charge less than 12% simple interest per year. Mot. at 11. But Hometap's insistence that it never charges interest at all, and that in some cases interest may be less than 12%, is contradicted by Hometap's inclusion in its agreements a "Hometap Cap" that is "equal to an annualized rate of return of twenty percent (20%) on the Investment Amount." Dkt. No. 41-1 at 5, § 2.2.

Hometap speculates that "scenarios exist in which Hometap would not recover its investment." Mot. at 11. But many credit transactions involve a risk that the lender will not be repaid. For example, TILA covers nonrecourse debt. *See, e.g.*, 15 U.S.C. § 1602(cc) (nonrecourse mortgage loan); *Burnett*, 3 F.3d at 1262 (pawn shops); *Feeman*, 2026 WL 880508, at *8 (other examples). The fact that the lender



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

could lose money if the collateral's value drops is simply a feature of a "nonrecourse obligation." *Olson*, 2025 WL 2254522, at *3. Accordingly, this does not prevent the transaction here from being a residential mortgage loan as a matter of law.

Even if there were such a requirement, as matter of "economic substance," *Burnett*, 3 F.3d at 1262, Hometap is guaranteed to get its advance back: the Hoffmans will have to pay Hometap either 41.435% or 49.722% of the value of their home, an amount that will be more  than the 29.833% they received—even without subtracting Hometap's thousands of dollars in opaque fees. Complaint ¶ 59-60. As explained above, Hometap will be repaid even if the house drops in value by 28%. As Federal Reserve housing data shows, that is far more than home prices have ever dropped in Washington State or across the country, including during the 2008 financial crash, when local lender Washington Mutual Bank lost so much money it collapsed.[8] The unlikelihood of Hometap losses is corroborated by Hometap's promotion of investing in Hometap based on its "Proven track record" of "8+ years delivering strong, risk-adjusted returns vs. comparable asset classes." Hometap Investment Homepage, https://invest.hometap.com (last accessed May 18, 2026).

Under a motion to dismiss standard, the Court must accept as true the Hoffmans' allegation that Hometap is guaranteed repayment as a practical matter. Dkt. No. 1-2 ¶ 49. And even under a summary judgment standard, this Court can consider the Federal Reserve website compiling housing market data from the Federal Housing Finance Agency. *See, e.g.*, Fed. R. Evid. 803(17), 902(5); *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (courts may consider evidence on summary judgment so long as contents are admissible); *Daniels-Hall v. Nat'l Educ.*

---

[8] Prices dropped from a peak index of 501.9 in Q4 of 2007 to a low of 375.44 in Q2 of 2012, a drop of 25.2%. All-Transactions House Price Index for Washington, Federal Reserve of St. Louis (last accessed Jan. 26, 2026), https://perma.cc/VXY9-76TB.; *See, e.g.*, All-Transaction House Price Index for the United States, Federal Reserve of St. Louis, (last updated accessed Jan. 26, 2026), https://perma.cc/J3FM-SGH7.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

*Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (taking judicial notice of information provided by government entities of undisputed accuracy); *Honchariw v. Cnty. of Stanislaus*, 530 F. Supp. 3d 939, 943 n.2 (E.D. Cal. 2021), *aff'd*, 2022 WL 522287 (9th Cir. Feb. 22, 2022) (taking judicial notice of FHFA house price index data).

Hometap has provided no evidence about its gains or losses, despite access to all its internal data on its transactions and their outcomes. The Hoffmans propounded five interrogatories to Hometap asking about just that. Chandler Decl., Ex. 1. Hometap refused to respond to any of the requests. *Id.* If the Court concludes there is question of fact that needs to be resolved to resolve the motion to compel, however, Hometap's motion should be denied without prejudice to renewal after it has responded to discovery—especially since Hometap's data about the outcomes of its loans is within its possession. *See, e.g., Knapke*, 38 F.4th at 833; *Singhal v. Unison Agreement Corp.*, 2023 WL 2734230, at *5 (S.D. Fla. 2023) (allowing case about similar transaction to "proceed through discovery" into whether it was a loan).

3. <u>Agency commentary on a regulation does not override the plain text of TILA.</u>

Hometap argues it product is not covered by TILA based on agency staff commentary. As an initial matter, the commentary in question does not purport to control the statutory definition, but instead accompanies a regulation and only applies to the definition of "credit" "for purposes of [that] regulation." 12 C.F.R. pt. 226, Supp. I, Subpt. A, cmt. 2(a)(14)(1) (emphasis added). Nor could staff commentary trump statutory text. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Even beyond that, neither of the exceptions to the regulation that Hometap invokes—"option contracts" and "investment plans"—apply here.

Hometap's product isn't an option contract. An option contract conveys "[t]he right to buy or sell something within a specified time and at a specified price."



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Option, *American Heritage Dictionary* (1st et. 1969); *Restatement (Second) of Contracts* § 25. Thus, an "option to purchase real estate involves the payment of consideration for the option itself and then the payment of the agreed-upon purchase price if the option is exercised." *Hometap*, 2025 WL 2468564, at *7 (emphasis added). Hometap's contract does not convey any future right to buy the Hoffmans' property at a specified price: It conveyed the right to receive future payment. That's a debt, not an option. *Id.* Hometap's reliance on the order in *Foster v. Equitykey Real Estate Invs. L.P.*, 2017 WL 1862527 (N.D. Cal. 2017), is misplaced. "The differences are clear" between Equitykey's and Hometap's products. *Hometap*, 2025 WL 2468564, at *7. "In *Foster*, return of any portion of the money was entirely contingent on . . . the property appreciating in value." *Id.* In contrast, under Hometap's Agreement, even if Hoffmans' home value drops significantly, Hometap will still receive 41.435% of the home value.

Had Hometap included an option mechanism, any agency commentary would still be subject to the general TILA principle that courts must look to substance over form—which is all the more warranted since the Ninth Circuit has recognized that options can be used to disguise debt. *Burnett*, 3 F.3d at 1262; *Olson*, 2025 WL 2254522, at *5 ("mere embedding of a formal option in a highly complex overall arrangement" does not "automatically exempt[] that arrangement from being classified as a credit obligation").

Nor is Hometap's product an "[i]nvestment plan[ ] in which the party extending capital to the consumer risks the loss of the capital advanced." 12 C.F.R. pt. 226, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(viii). Generally, an investment is "[a]n expenditure to acquire property or assets to produce revenue." Investment, *Black's Law Dictionary* (12th ed. 2024) (emphasis added). Acquiring property means taking on burdens of ownership and risks of loss, as illustrated by the commentary's



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

example: "[A]n arrangement with a home purchaser in which the investor pays a portion of the downpayment and of the periodic mortgage payments in return for an ownership interest in the property, and shares in *any* gain or loss of property value." 12 C.F.R. pt. 226, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(viii) (emphasis added). In contrast, Hometap doesn't acquire the property, Complaint ¶ 44, and doesn't share in the burdens of ownership, *see* Dkt. No. 14-1 § 6.2(e) (requiring the Hoffmans to cover all costs of homeownership).

Hometap ignores this portion of the agency commentary, focusing instead on the risk that it will lose its advance. Hometap Br. at 13. But as previously shown, Hometap doesn't genuinely risk losing its advance and doesn't share in "any" loss. And the mere fact that Hometap could lose money in an unprecedented crash makes it no different from any other nonrecourse loan secured by a home, and holding otherwise would allow companies to "circumvent" TILA. *Rossman*, 280 F.3d at 392, 399.

* * *

In sum, the transaction between the parties is a "consumer credit transaction … secured by a mortgage … on a dwelling," and therefore a "residential mortgage loan." 15 U.S.C. § 1602(dd)(5). As a result, it may not "include terms which require arbitration," *id.* § 1639c(e)(1)). Hometap's delegation and arbitration provisions are therefore invalid, and its motion should be denied.

### C. Hometap's delegation clause and arbitration provision are unconscionable under Washington law.

Even if TILA did not invalidate Hometap's purported delegation clause and arbitration provision, they are unconscionable under Washington state law. "Washington recognizes two types of unconscionability for invalidating arbitration agreements, procedural and substantive," and "[e]ither is sufficient to void the agreement." *Burnett v. Pagliacci Pizza, Inc.*, 470 P.3d 486, 494 (Wash. 2020).



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

"Procedural unconscionability applies to impropriety during the formation of the contract; substantive unconscionability applies to cases where a term in the contract is alleged to be one-sided or overly harsh." *Id.* In applying these standards "[t]he task of a federal court in a diversity action is to approximate state law as closely as possible." *Orkin v. Taylor*, 487 F.3d 734, 741 (9th Cir. 2007). And Washington courts have consistently held that contract provisions like Hometap's purported delegation clause and broader arbitration provision are unconscionable.

1. The delegation clause is procedurally unconscionable.

The delegation provision is procedurally unconscionable under Washington law. To begin, the provision is part of a "contract of adhesion"—a "form" contract presented on a "take it or leave it" basis by a drafting party with far more bargaining power. *Adler v. Fred Lind Manor*, 103 P.3d 773, 782 (Wash. 2004). The delegation clause is also buried in a "maze of fine print." *Burnett*, 470 P.3d at 495. And it is found on page 24 of a 37-page document in the middle of the fifth paragraph regarding arbitration. Dkt. No. 14-1 at 25 § 3.18(e). In contrast, other provisions of the arbitration clause in larger all caps font (*see id.* § 8.13(c)), effectively drawing the reader's attention away from the paragraph containing the delegation clause. *See Mattingly v. Palmer Ridge Homes LLC*, 238 P.3d 505, 512–13 (Wash. Ct. App 2010) (finding procedural unconscionability when provisions were on "page 7 of a 32 page booklet" even "though the provisions are in bold and in a typeface slightly larger than the surrounding text"); *Lim v. TForce Logistics*, LLC, 8 F.4th 992, 1001 (9th Cir. 2021) ("Nothing in the text of the agreement called Lim's attention to the delegation clause, and [the Hoffmans were] not required to sign or initial that specific provision."). The Hoffmans were not asked to initial the pages of the Agreement containing the arbitration provision or otherwise manifest awareness of the arbitration provision.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Indeed, the Hoffmans never saw the package of Hometap documents that includes the Agreement containing the arbitration clause until they arrived at a title company's office to sign the paperwork. It was there that the Hoffmans received an Investment Disclosures document that was the cover for the paperwork they were to sign. Hoffman Decl., ¶ 2-4, Ex. A. The six-page Investment Disclosures detail numerous terms included in the Agreement but say nothing about arbitration or delegation. *Id.* And the Investment Disclosures direct the homeowner to contact their Hometap "Investment Manager," not a lawyer or housing counselor, with any questions about the terms of the deal. *Id.* Moreover, the pressure inherent in the situation of meeting with title insurer documents related to financing that a consumer has already accepted (in the Hoffmans' case, months before) deprives the consumer of a reasonable opportunity to understand lengthy form documents before signing them.

Hometap's purported delegation clause was therefore presented in highly procedurally unconscionable manner, which is sufficient to render it "void." *Burnett*, 470 P.3d at 494.

## IV. CONCLUSION

Hometap's motion to compel arbitration should be denied because federal law prohibits arbitration clauses, including clauses that delegate arbitrability decisions, in mortgage loans. And Hometap's predatory financial product is a mortgage loan.

//

//

//

//

//

//



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

RESPECTFULLY SUBMITTED AND DATED this 1st day of June, 2026.

TERRELL MARSHALL LAW GROUP PLLC

*I certify that this memorandum contains 8,095 words, in compliance with the Local Civil Rules.*

By: /s/ Blythe H. Chandler, WSBA #43387
Beth E. Terrell, WSBA #26759
Email: bterrell@terrellmarshall.com
Blythe H. Chandler, WSBA #43387
Email: bchandler@terrellmarshall.com
Eleanor Eagan, WSBA #64463
Email: eeagan@terrellmarshall.com
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

*Attorneys for Plaintiffs*